IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


WILLIAM D. WILLIAMS,

        Plaintiff,

v.                              CASE NO.  4:12cv142-RH/CAS

WARDEN HALEY et al.,

        Defendants.

_____/


## ORDER GRANTING SUMMARY JUDGMENT IN PART


      This is a prisoner civil-rights case.  The plaintiff William D. Williams was

an inmate at Century Correctional Institution, part of the Florida Department of

Corrections.  Mr. Williams says the institution's librarian, the defendant Thomas

Brame, chose only whites as inmate law clerks or trainees, and that when Mr.

Williams filed grievances contesting the practice, Mr. Brame retaliated, including

by inducing an inmate to attack Mr. Williams with a shank.  Mr. Brame has moved

for summary judgment.  This order grants summary judgment on the race claim but

denies summary judgment on the retaliation claim.

## The State of the Pleadings

Mr. Williams filed this case in state court, but it was removed to this court. The operative pleading is the fourth amended complaint.  ECF No. 62.  Mr. Williams attempted to file a fifth amended complaint, ECF No. 71, to reassert claims and restore defendants who were previously dismissed.  See ECF Nos. 75, 77, 80, 84, and 90.  Mr. Williams has since clarified that he proceeds on the fourth amended complaint [hereinafter "complaint"].  ECF No. 80.  Mr. Brame's summary-judgment motion, ECF No. 74, was based on the fourth amended complaint.  Mr. Williams was advised of his obligation to respond to the summary-judgment motion, ECF No. 83, and the motion is ready for a ruling.

## Legal Standards Governing a Summary-Judgment Motion

On a defendant's summary-judgment motion, the defendant initially has the burden to demonstrate an absence of evidence to support the plaintiff's case.  *See Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).  If accomplished, the burden shifts to the plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  *Id.*  An issue of fact is "material" if it could affect the outcome of the case.  *Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  The plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, *Matsushita Electric Industrial Co., v. Zenith Radio Corporation*, 475 U.S. 574, 586

(1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hickson*, 357 F.3d at 1260, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  All reasonable inferences must be resolved in the light most favorable to the plaintiff as the nonmoving party, *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1216 (11th Cir. 1999.  *Scott v. Harris*, 550 U.S. 372, 380 (2007), cited in *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted), quoted in *Ricci v. DeStefano*, 557 U.S. at 586.

This court's local rules provide that statements of fact must "reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily locate and check the source."  N.D. Fla. Loc. R. 56.1(A). Facts in the defendant's statement of facts are deemed admitted only if supported by citations to evidence in the record and not controverted by a similar statement of fact by the opposing party.  N.D. Fla. Loc. R. 56.1(A).

### _Mr. Williams_'s Claims

Mr. Williams asserts claims under 42 U.S.C. § 1983 for racial discrimination in job assignments and retaliation for exercising First Amendment rights.  ECF No. 62 at 5.  Mr. Williams alleges he was not permitted to participate in the inmate law-clerk program, even though he had been acting as an "unofficial law clerk" for over a year, because of his race.  _Id._ at 5-6.  After Mr. Williams initiated the grievance process concerning that issue on February 12, 2010, Mr. Williams alleges that Mr. Brame began a campaign of retaliation and harassment against him.  _Id._ at 7-15.  Part of that campaign, as alleged by Mr. Williams, was an invitation by Mr. Brame to other inmates to attack and harm Mr. Williams.  _Id._ at 13-15.  Mr. Williams was ultimately attacked on July 30, 2010, requiring emergency surgery "and resulting in permanent disfigurement to Plaintiff's face."  _Id._ at 13-14.  Mr. Williams raises claims under the First, Eighth, and Fourteenth Amendments of the United States Constitution and Florida § 768.28, and seeks compensatory and punitive damages.  _Id._ at 17-18.

### Rule 56 Evidence

#### A.   Mr. Brame's Evidence

In June 2008, Mr. Brame's job assignment at Century Correctional Institution was changed from Wellness Education Specialist to Librarian Specialist.  Defendant's Ex. B (ECF No. 74-2).  The prior librarian, Ms. Gradia,

had given priority access to the law library to inmates with legal deadlines, and inmates could not physically access the law library without a deadline or a "call-out" pass.   Defendant's Ex. A at 11-13 (ECF No. 74-1).  Inmates with legal deadlines were given access sooner and could stay longer.  *Id.* at 12.  Mr. Williams was able to access the library approximately four to six hours per week while Ms. Gradia was the librarian.  Defendant's Ex. A at 2-3 (ECF No. 74-3).

When Mr. Brame became the librarian, he opened the library for longer hours, and an inmate was sometimes permitted to access the library even if the inmate did not have a pass.  *Id.* at 46-48.  Mr. Williams stated in his deposition that he could "pretty much" be in the library for as much as 40 hours a week.  *Id.* at 48.  Prior to Mr. Brame becoming librarian, the library was only open to the general population for approximately 25 hours a week.  Defendant's Ex. B at 2 (ECF No. 74-2).

Mr. Brame states in his affidavit that Mr. Williams would sometimes "spend upwards of forty (40) hours in the library, even though his institutional work assignment was not to the library."  Defendant's Ex. B at 2.  Mr. Brame eventually "found out that [Mr. Williams] was bartering his services as a prison lawyer to other inmates housed at Century Correctional Institution."  *Id.*

Mr. Brame avers that the "increased hours and the additional inmates accessing the library became a management problem."  *Id.*  The administration

noticed that "there were too many inmates spending too much time in the library." *Id.* The Assistant Warden Scott Payne implemented a policy in March of 2010 that would not permit inmates to access the library during lunch time and required the library to adopt an access system. Defendant's Ex. B (ECF No. 74-2). Inmates needed either a legal deadline or a "call-out" to access the library. *Id.* Inmates could no longer go to the library during lunch hours, and Tuesdays and Thursdays were reserved for inmates with legal deadlines. *Id.* at 2-3. The library did remain open on Mondays, Wednesdays, and Fridays to anyone with a call-out pass. *Id.* at 3. Mr. Brame "frequently received more requests for library callouts than" were available which, at times, would require scheduling inmates to come to the library "at a later week." *Id.* at 3.

At approximately the same time these changes were implemented, Mr. Brame called a meeting of all the inmates who were then in the library, which he says consisted mostly of inmate staff. Defendant's Ex. B at 3 (ECF No. 74-2). "Many inmates were understandably upset about the change in the library's hours." *Id.* Mr. Brame avers that he "made it clear to everyone who was present that the changes in the general population's ability to access the library came about as a result of the many inmates who were abusing the extent to which inmates were permitted to access the library . . . ." *Id.* Mr. Brame "made it clear that no one inmate was responsible for the library's changes." *Id.* Mr. Brame avers that he

"was not telling anyone to 'target' [Mr. Williams.]"  *Id.*  Mr. Brame "was merely attempting to rally certain inmates so that they would not believe that all the personal work they had done . . . would be in vain."  *Id.*  Mr. Brame advises that he made similar speeches on numerous occasions because "it is simply what athletic coaches do."  *Id.*

Librarians like Mr. Brame do not have authority to assign a particular inmate to work in the library.  Defendant's Ex. B at 3 (ECF No. 74-2).  Classification officers make those assignments.  *Id.*  Mr. Brame states that "there is no statute, rule, custom, policy, or unwritten policy at Century Correctional Institution that prohibits the placement of black inmates into the law clerk training program."  *Id.*  Mr. Brame did not have "authority to allow an inmate to bypass the law clerk training program by completing the written examination—that test is administered by the office of library services."  *Id.*

An inmate law clerk is "assigned to work in a law library" and must have successfully completed the department's law-clerk training program (or have equivalent legal training) and have "'LEGAL' or 'LAW' certificate entries in the department's offender database."  Defendant's Ex. D (Hughes affidavit; ECF No. 74-4 at 1).  Mr. Brame submits that there are only two possible ways for an inmate to become a certified law clerk.  *Id.*  The first is by completing the Department's law-clerk training program, established by Florida Administrative Code Rule 33-

501.301(7)(e).  An inmate desiring to become a law-clerk trainee "must first be assigned to the program by the inmate's classification officer."  Defendant's Ex. D (ECF No. 74-4).  Alternatively, an inmate must "have a minimum score on the Test of Adult Basic Skills (TABE) and successfully pass a written examination administrated by the office of library services."  ECF No. 74 at 13.

The rules provide that "inmates who have no formal training in legal research and who wish to work as inmate law clerks in law libraries shall be assigned as law clerk trainees, and shall be required to attend and successfully complete the law clerk training program."  Fla. Admin. Code R. 33-501.301(7)(b) (effective 6/16/2009).  The rule also states that "[i]nmates assigned as law clerk trainees shall not assist inmates in the preparation of legal documents and legal mail, and shall not be assigned to conduct confinement visits unless accompanied by an inmate law clerk."  *Id.*  Only inmate law clerks are permitted "to assist inmates in the research and use of print and digital or non-print resources in the law library collection, and in the drafting of legal documents, legal mail, administrative actions filed with the Florida Parole Commission, the Florida Bar, and other administrative bodies, and inmate grievances filed with the Department of Corrections."  Fla. Admin. Code R. 33-501.301(7)(c) (effective 6/16/2009).

There are four required qualifications to be an inmate law clerk:

1. Have a high school diploma, general educational development, or Test of Adult Basic Education total battery scores of

grade 9.0 or higher, or otherwise demonstrate that he or she possesses the reading and language skills necessary to read and understand the law, to conduct legal research, and to assist other inmates in legal research and the preparation of legal documents.

2. Have a release date that indicates that he or she has sufficient time remaining on his or her sentence to complete the law clerk training program and to perform work in the law library;

3. Have a satisfactory record of institutional adjustment;

4. Display a willingness to work and cooperate with others and the ability to perform the general duties of an inmate law clerk, including good oral and written communication skills, good comprehension and intelligence.

Fla. Admin. Code R. 33-501.301(7)(d) (effective 6/16/2009).

Florida Administrative Code Rule 33-501.301(7)(f) also allows an inmate to be "certified by the office of library services without having to complete the law clerk training program" if the inmate has "prior educational or work experience in the law" or "possess[es] current knowledge of the law, knowledge of legal research materials and how to use them."  Such "educational or work experiences" include:

1. Receipt of an associate or bachelor's degree in paralegal research or pre-law;

2. Receipt of a juris doctorate degree;

3. One or more years of verifiable work experience as a paralegal working under the direct supervision of an attorney; or

4. Successful completion of a written examination developed by the office of library services that verifies that an inmate possesses current knowledge of the law, knowledge of legal research materials and how to use them, and can communicate effectively in writing.

Fla. Admin. Code R. 33-501.301(7)(f) (effective 6/16/2009).  When this rule was amended on April 19, 2010, the exception listed in paragraph 4 was eliminated. Fla. Admin. Code R. 33-501.301(2)(f) (effective 4/19/2010).

At the time Mr. Brame was reassigned to the Librarian Specialist position in June 2008, he inherited the staff already assigned to the library.  Defendant's Ex. B (ECF No. 74-2).  There were four possible inmate work assignments in the library—library clerk, library orderly, certified law clerk, and law-clerk trainee. ECF No. 74 at 10; Defendant's Ex. C (ECF No. 74-3).  The staff was composed of four certified law clerks (two were black, one was white, and one was Hispanic); two law-clerk trainees (both were white); and nine library clerks (three were black and the rest white).  *Id.*  There were no library orderlies at that time.

After Mr. Brame began working as the librarian, and before Mr. Williams was transferred out of Century, the staff increased to five certified law clerks (two were black, three were white); five law-clerk trainees (two were black, three were white); six library clerks (two were black, three were white, and one was Hispanic); and twelve library orderlies (seven were black, two were white, and three were Hispanic).  ECF No. 74 at 11-12; Defendant's Ex. C (ECF No. 74-3). After Mr. Williams was transferred on August 24, 2010, Mr. Brame continued working as the librarian until February 4, 2012, and during that time, four more law-clerk trainees were assigned to the law library (two black and two white), eight

library clerks were assigned (four black, three white, and one Asian), and four

more library orderlies were assigned (two black, two white).  ECF No. 74 at 12-13;

Defendant's Ex. C (ECF No. 74-3).  Mr. Brame did not, however, make those

assignments; inmate job assignments are made by classification officers.

Defendant's Ex. D (ECF No. 74-4, Hughes affidavit).  If an inmate wishes to

request a job reassignment, that request must be directed to his classification

officer.  *Id.* at 2.

Mr. Brame avers that he does not have personal knowledge of who assaulted

Mr. Williams.  Defendant's Ex. B at 3 (ECF No. 74-2).  He states that institutional

"records indicate that [Mr. Williams] either slipped and fell on a bench, or got into

a fight with Inmate Mickey Sutton . . . ."  *Id.*  Mr. Sutton was "never assigned to

work in the library" and "would not have been present in the library during the

speech" Mr. Williams alleged Mr. Brame made in March of 2010.  *Id.*

On July 30, 2010, at approximately 9:15 p.m., Mr. Williams approached the

G Dorm officer's station "bleeding heavily from his face."  Defendant's Ex. G (ECF

No. 74-7).  Mr. Williams reported that he "slipped and fell" and hit a bench when

he "was walking up there to turn up the TV." *Id.*  Mr. Williams was taken to the

infirmary and then transported to the hospital for treatment.  *Id.*  During the

investigation, blood was discovered in Mr. Williams's cell, and a trail of blood led

from Mr. Williams's cell down the stairway to the wing door.  *Id.*  Inmates in that

wing were ordered to report to their cells.  A blood-stained blue shirt with the name tag removed was found in a shower cell on the wing.  *Id.*  Mr. Williams's cell was searched, and a blood-stained bedsheet was found under the sink, blood was found on both sides of the toilet, and a wash rag with evidence of blood was found in the cell sink.  *Id.*  An investigation into the incident was unsuccessful; the investigation did not uncover evidence sufficient to determine what happened.  *Id.*  A recommendation was made, however, to transfer Mr. Williams to another facility.  *Id.*

A few days later, an inmate identified Mr. Sutton as the person who assaulted Mr. Williams.  Defendant's Ex. H (ECF No. 74-8).  Mr. Williams was interviewed again.  *Id.*  This time, Mr. Williams changed his story.  He said that Mr. Sutton had attempted to incite inmate Walker to fight Mr. Williams when they were arguing about the television, that Mr. Walker declined, and that Mr. Sutton attacked Mr. Williams with a shank.  *Id.*  The investigation produced an inmate statement asserting that Mr. Sutton and Mr. Williams were fighting and another statement asserting that Mr. Sutton was indeed the person who cut Mr. Williams.  Defendant's Ex. H (ECF No. 74-8 at 3, 12).  Mr. Sutton denied involvement.  ECF No. 74-8.  Ultimately, because Mr. Williams gave conflicting statements, officials concluded that there was insufficient evidence to charge Mr. Sutton with cutting Mr. Williams.  *Id.*

Nearly a month after the attack, on August 30, 2010, Mr. Williams was transferred from Century to Mayo Correctional Institution.  Defendant's Ex. P (ECF No. 74-16).   Mr. Williams became a certified law clerk on April 29, 2011. Defendant's Ex. I (ECF No. 74-9).

## Mr. Williams's Evidence

Mr. Williams was not assigned to work as a law clerk, nor was he assigned as a law-clerk trainee, but since 2009 he had been assigned the job of "houseman." Plaintiff's Ex. I (ECF No. 87-8 at 3, 5); Ex. K (ECF No. 87-8 at 16).  In late February 2010, Mr. Williams's job was reassigned to "inside grounds."  Plaintiff's Ex. I (ECF No. 87-8 at 3, 5).  Mr. Williams submitted to Classification in April 2010 a request "to be assigned to the law clerk trainee program in the law library." Plaintiff's Ex. I (ECF No. 87-8 at 4).  The response from J. Thomas to that request said only, "You are currently assigned to inside grounds."  *Id.*

Mr. Williams states in his affidavit that although Classification does assign inmates to work in the library, "the librarian would nevertheless have to approve of the assignment."  Plaintiff's Ex. A3 (Plaintiff's affidavit; ECF No. 87-4 at 14).  Mr. Williams reports that the librarian has the ability to request Classification assign an inmate to work in the library.  *Id.* at 15; Ex. A3 at 2.  Mr. Williams personally observed Mr. Brame call Classification and have inmate Roderick Ward "reassigned as a law clerk within two (2) minutes of picking up the phone."  *Id.*

While not specifically alleged in the affidavit supporting Mr. Williams's opposition to summary judgment, Mr. Williams did provide a sworn statement of facts in the Complaint asserting that he was "permitted and encouraged to act as an unofficial law clerk" by Mr. Brame.  Complaint, ECF No. 87-3 at 6.  Factual allegations in a sworn pleading are treated the same as sworn statements in an affidavit.  *See, e.g.*, *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir.1986).  And in support of his assertion, Mr. Williams has provided a copy of a memorandum issued by Mr. Brame as the Century Librarian to the Law Library at Glades Correctional Institution dated October 13, 2008.  Plaintiff's Ex. B (ECF No. 87-5 at 2).  The memorandum concerns another inmate who had previously been housed at Century and "received legal assistance from" Mr. Williams.  *Id.*  Under departmental rules, a "law library supervisory at the institution from which an inmate is transferred may authorize an inmate law clerk at that institution to continue assistance to the transferred inmate on a pending matter if the inmate's new institution and the inmate requests continued assistance in writing."  *Id.*  Mr. Brame stated that Mr. Williams was willing to continue to assist inmate Israel "as he has numerous hours of research and assistance involved."  *Id.*

Mr. Williams asserts in his affidavit that "Brame did not hire, or assign, or cause to be assigned a single black inmate to the law library during the time beginning from June 2008 - February - July 2010 as all black inmates who worked

in the law library, were there before Brame's assignment." *Id.*  Mr. Williams states that he was "assigned only as an unofficial law clerk and given every privilege of the other law clerks." *Id.*  Mr. Williams states that he "was assigned inmates to assist who were then placed on call out next to [his] name to see [Mr. Williams] for that assistance." *Id.*  Mr. Williams says that no inmate paid anything and Mr. Brame made the assignments "himself, because he, and everyone who has ever met [Mr. Williams], know that law is [his] passion."  ECF No. 87-4 at 19-20; Plaintiff's affidavit at 6-7.

Mr. Williams asserts that the basis for Mr. Brame's reprisal was that Mr. Williams wanted to be placed in the law-clerk training program, but Mr. Brame told Mr. Williams he should pursue the program at his next institution.  Complaint, ECF No. 87-3 at 7.  Mr. Williams states that after he filed his grievances, there was "constant harassment by" Mr. Brame "in the presence of his friends each and every time [Mr. Williams] was in the library."  Plaintiff's affidavit at 7.  Mr. Williams said that he did not know when he would be transferred and wanted to immediately start the law-clerk training program.  *Id.*  Mr. Williams told Mr. Brame he believed the reason he was not permitted to be in the program was because he was black. *Id.*  On February 12, 2010, Mr. Williams asked Mr. Brame for his final answer on the program, and Mr. Brame told Mr. Williams that he was not going to address that right now, and Mr. Williams should take it up with Classification.  *Id.*  Mr.

Williams asserts that Mr. Brame told Mr. Williams if he pushed on this matter, he "would merely assign some other black inmate to the program." *Id.* Mr. Williams also stated that both he and Mr. Brame knew that "without a request from" Mr. Brame, his request to be in the program would not be granted. *Id.*

On February 12, 2010, Mr. Williams began the grievance process concerning his desired placement in the program. Complaint (ECF No. 87-3 at 7). During a conversation between Mr. Williams and Mr. Brame four days later, Mr. Brame "pointed out a portion of the grievance in which he . . . indicated Plaintiff had called him a racist." *Id.* at 8. Further discussion ensued, and Mr. Brame told Mr. Williams to get out of his office. *Id.*

Six days later, an officer came to Mr. Williams's cell looking for legal work belonging to another inmate who had been transferred. Complaint (ECF No. 87-3 at 8-9). Mr. Williams advised that the work was possibly "stored in the library because that is where Plaintiff normally stores the documents when not working on them." *Id.* at 9. The next day, "February 23, 2010, Mr. Williams went to his scheduled law library call-out" and told Mr. Brame that Mr. Williams was requested to look for documents belonging to inmate Cooper. *Id.* Mr. Williams located the documents and advised Mr. Brame that the officer had told Mr. Williams to given them to Mr. Brame. *Id.* Mr. Williams states that rather than accept the documents, Mr. Brame walked away and told Mr. Williams he would be

with him in a few minutes.  *Id.*  After some time, Sergeant Jackson arrived in the library and told Mr. Williams to "turn around and cuff up."  *Id.* at 9-10.  Mr. Williams was told he was going to confinement because he "was in possession of" another inmate's legal documents.  *Id.* at 10.  Mr. Williams asked Mr. Brame to clear up the situation because Mr. Brame had authorized Mr. Williams to assist inmate Cooper.  *Id.*  Mr. Brame replied that the matter had nothing to do with him and told Mr. Williams, "you clear it up yourself since you're so smart."  *Id.*

Mr. Williams says that the next day, Mr. Brame was escorted to Mr. Williams's cell.  Mr. Brame apparently has admitted being in the area.  Plaintiff's Ex. A-5 (ECF No. 87-4 at 27).  According to Mr. Williams, Mr. Brame said, "you get the point now Williams, your grievance is going to be denied as addressing more than one issue and that's where it'll stay."  Complaint (ECF No. 87-3 at 10). Mr. Brame told Mr. Williams it would be best for him to try to enter the law-clerk training program at his next institution.  *Id.* at 11.  When Mr. Williams asked when that would be, Mr. Brame told Mr. Williams, "Not at all if I have any more trouble out of you."  *Id.*  Mr. Brame said he would take care of the disciplinary report but told Mr. Williams he did not want any more trouble out of him and that Mr. Williams should "back off with the program and [his] grievance."  *Id.*  Mr. Williams reported that "on March 4, 2010, Plaintiff was released from confinement

without any actions being taken in regards to the D.R."  *Id.*; *see also* Plaintiff's Ex. E (ECF No. 87-6 at 15-16).

Mr. Williams produced an informal grievance sent to the law library on February 12, 2010, in which Mr. Williams primarily questioned why Mr. Brame would not allow him to participate in the law library and complained that the four trainees assigned by Mr. Brame were all white.  Plaintiff's Ex. D (ECF No. 87-6 at 9).  The response from Mr. Brame was that the grievance was returned because it "contained more than one issue."  *Id.*

Mr. Williams has demonstrated that on March 4, 2010, "a memo was placed in all dormitory housing units signed by Brame in regards to new rules implemented by Brame with respect to access to the library."  Plaintiff's Ex. A-5 (ECF No. 87-4 at 28).  Mr. Williams also has stated that on March 5, 2010, all the "rights and privileges" Mr. Williams previously enjoyed were revoked.  Complaint (ECF No. 87-3 at 11).  Mr. Williams's time in the library was cut short and during his time in the library, Mr. Brame made a speech advising that he had "been called a racist, and until you get this plague out of our community, some changes" would take place.  *Id.* at 11-12.  Mr. Brame announced that the hours were reduced, and inmates could no longer go to the library unless they had a "call-out."  *Id.*  Mr. Brame said the rules would "be in place until you get this disease out of our community, I'm not going to do it for you, you have to do it."  *Id.* at 12.

Mr. Williams explains "the game" in his affidavit, asserting that if an inmate wrote a grievance or otherwise did something Mr. Brame "did not approve of," inmates who were part of the "privileged' law library staff would approached the inmate "and persuade him to cease the activity."  ECF No. 87-4 at 17; Plaintiff's affidavit at 4.  Mr. Williams states that he personally spoke with inmate Richie after that inmate wrote a grievance, as did inmate Trey Lewis, and suggests it was at the behest of Mr. Brame.  *Id.*  Mr. Williams advises that "inmate staff, including [Mr. Williams], never had to actually physically deal with an offender because normally people who write grievances or who attend the library for genuine purposes, are not usually violent people."  *Id.*

Mr. Williams declares that Mr. Brame's speech to the inmates was made on March 5 and Mr. Sutton was present at that time.  ECF No. 87-4 at 17; Plaintiff's affidavit at 4.  Mr. Williams contends that after the speech, Mr. Brame began denying access to a "black gang," while allowing access to an Hispanic gang, and "telling the black gang members whenever they were present, to thank [Mr. Williams] for their restricted access or some rule change . . . ."  ECF No. 87-4 at 17; Plaintiff's affidavit at 4.  Mr. Williams avers that the gang members approached him about his dispute with Mr. Brame, claiming Mr. Williams was ruining things for them with the library.  *Id.*  Mr. Williams states that when people became more hostile, he "wrote grievances advising that the librarian was inciting these people

and endangering [his] life . . . ."  ECF No. 87-4 at 18; Plaintiff's affidavit at 5.  In

late May and early June, Mr. Williams realized that Mr. Brame was "playing 'the

game' and that" people had approached him.  *Id.*  Mr. Williams avers that Mr.

Brame became more aggressive to Mr. Williams, "physically bumping into [him]

deliberately" and more people began approaching Mr. Williams.  *Id.*

Mr. Williams "tried to back Brame off by letting him know that [Mr.

Williams] knew more about what was going on . . . ."  ECF No. 87-4 at 18;

Plaintiff's affidavit at 5.  Mr. Williams became more of a "topic for discussion" and

there was "concern from friends about [his] safety."  ECF No. 87-4 at 18-19;

Plaintiff's affidavit at 5-6.  In late June and July, Mr. Sutton was accessing the

library "once or twice every other week or so, and began telling people that Brame

was going to hire him in the library . . . ."  ECF No. 87-4 at 19; Plaintiff's affidavit

at 6.  Mr. Sutton was in the library one day during the week Mr. Williams was

stabbed.  *Id.*  When Mr. Sutton stabbed Mr. Williams, "he was extremely upset

about either not getting the job, or not having enough access, and stated that [Mr.

Williams] was the cause."  *Id.*

Mr. Williams states that from the day he wrote a grievance on February 12,

2010, until he was stabbed, Mr. Brame did not "let up," but retaliated against Mr.

Williams by "revoking all law clerk privileges, and putting [Mr. Williams] in

confinement . . . ."  *Id.*  Mr. Williams avers that Mr. Brame was responsible for

changing his job assignment "from houseman to inside grounds, denied access to the library" and "continuously changed rules so that persons who did business in the library, would be directly affected and do something to [Mr. Williams] about it." *Id.*

## Equal Protection

"To establish an equal protection claim, a prisoner must demonstrate that (1) he is similarly situated with other prisoners who received more favorable treatment[ ] and (2) his discriminatory treatment was based on some constitutionally protected interest such as race." *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001) (internal quotation omitted), quoted in *Dumel v. Elvin*, 561 F.App'x 869, 870 (11th Cir. 2014).  Mr. Brame contends that "Plaintiff has not established" a claim of discrimination based on race and that summary judgment should be granted in Mr. Brame's favor.

Mr. Brame's evidence is that he does not assign inmates to work in the library, nor does he have the authority to allow an inmate to bypass the training program.  But Mr. Williams has presented evidence that would support a contrary finding—a finding that Mr. Brame had the ability to have persons assigned to the library.  Nevertheless, Mr. Brame also submitted evidence showing that there was no discrimination against black inmates.  After Mr. Brame became the librarian, he continued to have several certified law clerks who were black.  Inmates Lewis and

Ward were certified law clerks, and inmates Edouard, Jacobs, Sigler, and Holmes were law-clerk trainees; all were black.  Defendant's Ex. C (ECF No. 74-3).  More importantly, Mr. Brame added four black law-clerk trainees; the only previous trainees were white.  In addition, Mr. Brame continued to have several library clerks who were black, and he added twelve library orderlies, seven of whom were black.  Mr. Williams's assertion "that no black inmate had been permitted in the program," *see* ECF No. 87 at 16, is refuted by the evidence.  Defendant's Ex. C (ECF No. 74-3).

Although Mr. Brame points out that Mr. Williams was never assigned to the library and, instead, was assigned the job of houseman or inside grounds, Mr. Williams has pointed out that Mr. Brame did use and authorize Mr. Williams's services as an inmate law clerk.  As early as October 8, 2008, Mr. Brame issued a memorandum for Mr. Williams to continue his assistance as a law clerk to inmate Israel who had been transferred to Glades.  (ECF No. 87-5 at 2).  Furthermore, in April 2011, after Mr. Williams was transferred away from Century, he passed the written examination and became a certified law clerk, showing he was qualified.

In sum, although Mr. Williams was qualified to be a law clerk and worked in that capacity to some degree, Mr. Williams has not come forward with evidence sufficient to create a genuine dispute of material fact on whether he was denied

entry into the law-clerk training program because of his race. Mr. Brame is entitled to summary judgment on the Equal Protection claim.

## First Amendment Retaliation

It is well established that an inmate exercises his First Amendment right of freedom of speech when he complains about the conditions of his confinement in the prison grievance process. *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003). It is also well established that "[t]he Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989), cited in *Farrow*, 320 F.3d at 1248. To present a viable retaliation claim, an inmate must establish: (1) that his speech was constitutionally protected; (2) that he suffered adverse action; and (3) there is a causal relationship between the adverse actions and the protected speech. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005) (holding that "[a] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights.").

It is not disputed that Mr. Williams engaged in protected First Amendment activities when he filed grievances. Mr. Williams has presented evidence that Mr. Brame was aware of those grievances. While Mr. Brame contends that the library hours and policies would have been changed even without Mr. Williams's

grievances because Assistant Warden Payne implemented the changes, Mr.

Williams has created a genuine dispute of fact concerning the retaliation claim.

Mr. Williams points out the omission of any memorandum issued by Assistant

Warden Payne.  Moreover, the March 4, 2010, memorandum that was placed in the

dormitories on the new library rules was signed by Mr. Brame.  A reasonable jury

could conclude that Mr. Williams's grievances against Mr. Brame were a

motivating factor in creating new library policies designed to create enough

dissatisfaction by the inmate population that Mr. Williams would cease his

protected First Amendment activities.  Construed in the light most favorable to Mr.

Williams, Mr. Williams has presented evidence showing that Mr. Brame was

involved in the issuance of a disciplinary report against Mr. Williams causing him

to be placed in confinement, that Mr. Brame came to Mr. Williams's cell to

verbally threaten Mr. Williams and direct him to stop filing grievances, and that

Mr. Brame made a public announcement or speech to inmates in the library that

new rules would limit their access to the library and that they could "thank" Mr.

Williams for those changes.  Mr. Williams has presented sufficient evidence that

Mr. Brame caused other inmates to take action against Mr. Williams because of

Mr. Williams's grievances.  Mr. Brame is not entitled to summary judgment on the

First Amendment claim.

C.   **Eighth Amendment**

"[W]hen the State by the affirmative exercise of its power so restrains an

individual's liberty that it renders him unable to care for himself, and at the same

time fails to provide for his basic human needs--e.g., food, clothing, shelter,

medical care, and reasonable safety--it transgresses the substantive limits on state

action set by the Eighth Amendment. . . ."   *Helling v. McKinney*, 509 U.S. 25, 31-

32 (1993), quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S.

189, 199-200 (1989).  "The Eighth Amendment proscription against cruel and

unusual punishment requires prison officials to take reasonable measures 'to

protect prisoners from violence at the hands of other prisoners.' "   *Jones v. St.*

*Lawrence*, No. CV408-095, 2008 WL 5142396 at *5  (S.D. Ga. Dec. 5, 2008),

quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (noting that "gratuitously

allowing the beating or rape of one prisoner by another serves no 'legitimate

penological objectiv[e]' ").  A complaint that alleges a prison official conspired to

have one inmate assault another inmate states a claim under the Eighth

Amendment.  *Davis v. Hodges*, 481 F.App'x 553, 554 (11th Cir. 2012) (reversing

dismissal of § 1983 claim).  "When a prison guard incites other prisoners to beat a

fellow inmate, 'it is as if the guard himself inflicted the beating as punishment.' "

*Northington v. Jackson*, 973 F.2d 1518, 1525 (10th Cir. 1992), citing *McGill v.*

*Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991, quoted in *Jones*, 2008  WL 5142396

at \*5.

    *Jones* said this:

>     Numerous courts—including the Eleventh Circuit—have
> recognized that inciting other inmates to harm a prisoner, such as by
> labeling the prisoner a "snitch" or informant, has the potential for
> great harm and may constitute a violation of the Eighth Amendment.
> *Benefield v. McDowall*, 241 F.3d 1267 (10th Cir. 2001) (allegation
> that corrections officer deliberately exposed inmate to harm at the
> hands of other inmates after labeling him a "snitch" was sufficient to
> state a violation of the inmate's Eighth Amendment rights);
> *Northington*, 973 F.2d at 1525 (allegation that guard intended to harm
> inmate by inciting other inmates to beat him because he was a "snitch"
> stated an Eighth Amendment claim); *Valandingham v. Bojorguez*, 866
> F.2d 1135, 1138-39 (9th Cir. 1989) (allegation that guards labeled
> prisoner a "snitch" with the intent of having him harmed by other
> inmates supported a cause of action under § 1983 for violation of the
> inmate's constitutional rights); *Harmon v. Berry*, 728 F.2d 1407, 1409
> (11th Cir. 1984) (per curiam) (allegation that correctional officer
> endangered prisoner's life by telling other inmates that he was a
> snitch, thereby exposing him to the possibility of inmate retaliation,
> stated a claim for relief); *Gullatte v. Potts*, 654 F.2d 1007, 1012 (5th
> Cir. Unit B 1981) (when prison officials are aware of a danger to an
> inmate's health or safety due to his "snitch" status, they violate the
> Eighth Amendment proscription against cruel and unusual punishment
> by failing to afford that inmate reasonable protection); *Wheeler v.
> North Dakota*, No. 1:07 CV075, 2008 WL 53544 (D.N.D. Jan. 2,
> 2008) (on initial screening pursuant to 28 U.S.C. § 1915A, prisoner
> allowed to proceed with a claim that prison staff identified him as an
> informant or "snitch," thus making him a target for retaliation);
> *Haywood v. Woods*, No. 9:01 CV225, 2007 WL 1834641 (N.D.N.Y.
> June 25, 2007) (allegation that prison officials labeled inmate as an
> informant, causing him to be threatened and have human waste
> thrown at him, and resulting in the extortion of his food and the loss
> of his daily recreation, stated an Eighth Amendment claim);
> *Ascherman v. Catt*, No. IP WO-1330-C H/K, 2003 WL 1562213
> (S.D.Ind. Feb. 26, 2003) (awarding damages to a prisoner who was

beaten after corrections officials identified him as a snitch to other inmates and were deliberately indifferent to a serious threat to his safety).

*Jones*, 2008  WL 5142396 at *5.

Mr. Brame asserts that Mr. Williams's Eighth Amendment claim fails because even if Mr. Sutton attacked Mr. Williams on July 30, 2010, the attack came nearly five months after Mr. Brame's speech on March 5, 2010.  ECF No. 74 at 27.  Mr. Brame says that is too long to show a causal relationship.  Mr. Brame also argues that Mr. Williams's injury may have been the result of Mr. Williams slipping and falling as first reported by Mr. Williams.  ECF No. 74 at 28.

Mr. Williams has created a genuine dispute of material fact on this claim. Mr. Brame contends in his affidavit that he did not incite other inmates to attack Mr. Williams, and Mr. Williams has provided sworn testimony that he did.  Mr. Brame asserts that Mr. Sutton was not in the library when the so-called "speech" was made, and Mr. Williams has sworn that he was.  Mr. Williams has also presented testimony that Mr. Sutton made statements at the time of the attack that he was extremely upset about not having enough library access and blamed Mr. Williams for that circumstance.

Although Mr. Williams initially said he fell and injured himself, Mr. Williams now swears to the contrary.  A reasonable jury could conclude that Mr. Williams was initially afraid to report the truth.  And in any event, several other

witness statements support Mr. Williams's current version of the events, and the amount of blood found by investigators casts doubt on the assertion that Mr. Williams fell and hit a bench.

It is true, as Mr. Brame says, that the timing of the alleged attack does not, without more, support an inference of causation.  But here there is more. Retaliation is actionable even when it occurs five months or longer after protected activity.  Mr. Brame is not entitled to summary judgment on this claim.

## State Law Claim

Mr. Brame contends that he "cannot be sued in federal court for negligence in his individual or official capacity."  ECF No. 74 at 28.  The assertion is incorrect.  A state employee sued in his individual capacity has no more immunity in federal court than in state court.  Under Florida Statutes § 768.28(9), an individual state employee can be sued for acts that are either outside the scope of employment or undertaken "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  This is a high standard, but if Mr. Williams meets it, Mr. Brame will have no sovereign immunity.

Mr. Brame also has no Eleventh Amendment immunity, both because a defendant sued individually has no Eleventh Amendment immunity and because, by removing the action, Mr. Brame waived any Eleventh Amendment immunity he

otherwise would have had.  *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535

U.S. 613, 616, 624 (2002) (holding that "removal is a form of voluntary invocation

of a federal court's jurisdiction sufficient to waive the State's otherwise valid

objection to litigation of a matter (here of state law) in a federal forum.").

## Qualified Immunity

Qualified immunity protects government officials from liability for civil

damages unless they violate a statutory or constitutional right that was clearly

established at the time the alleged violation took place.  *Pearson v. Callahan*, 555

U.S. 223, 231 (2009); *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1184 (11th Cir.

2009).  "The purpose of [qualified] immunity is to allow government officials to

carry out their discretionary duties without the fear of personal liability or

harassing litigation, protecting from suit 'all but the plainly incompetent or one

who is knowingly violating the federal law.' "  *Gilmore v. Hodges*, 738 F.3d 266,

272 (11th Cir. 2013) (citations omitted).

It has long been well established that a prison official "may not retaliate

against inmates for filing lawsuits or administrative grievances."  *Wright v.*

*Newsome*, 795 F.2d 964, 968 (11th Cir.1986), cited in *Smith v. Fla. Dep't of*

*Corrs.*, 318 F.App'x 726, 728 (11th Cir. 2008).  It has been well established since

*Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984), and *Farmer v. Brennan*,

511 U.S. 825 (1994), that a correctional officer violates the Eighth Amendment

when he incites other inmates to attack a prisoner.  If, as Mr. Williams alleges, that is what Mr. Brame did, he is not entitled to qualified immunity.

## Conclusion

For these reasons,

IT IS ORDERED:

1.   The summary-judgment motion, ECF No. 74, is GRANTED IN PART and DENIED IN PART.

2.  The equal-protection claim is dismissed with prejudice.  I do *not* direct the entry of judgment under Federal Rule of Civil Procedure 54(b).

3.  The First Amendment retaliation, Eighth Amendment, and state-law claims remain pending.

4. The clerk must set a pretrial conference by telephone for the first available date on or after October 13, 2014.

SO ORDERED on September 25, 2014.

s/Robert L. Hinkle_____
United States District Judge